**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GEORGE KOCHER,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:17-2127** |
| **v.** | : | **JUDGE MANNION** |
| **MUNICIPALITY OF KINGSTON and** | : | |
| **MAYOR JAMES HAGGERTY,** | | |
| | : | |
| **Defendants** | | |

## MEMORANDUM

Pending before the court is the motion for summary judgment, pursuant to Fed.R.Civ.P. 56, filed by defendants Municipality of Kingston ("Kingston")[1] and James Haggerty, former Mayor of Kingston, (Doc. 15), with respect to the common law claim and the federal claims against them in the amended complaint of plaintiff George Kocher. (Doc. 1-1 at 13-19). The plaintiff asserts a common law claim of retaliation against defendants with respect to the filing of his workers' compensation claim. The plaintiff brings federal claims, under the Americans with Disabilities Act, ("ADA"), alleging disability discrimination and retaliation for requesting a reasonable accommodation after his knee injury which occurred during his employment as a police officer with Kingston. Further, the plaintiff asserts disability discrimination and retaliation claims

---

[1]Defendants note that although plaintiff refers to Kingston as the "Borough" in his amended complaint, "Kingston is designated under Pennsylvania law as a Municipality by virtue of the fact that it operates under a Home Rule Charter." As such, the court has substituted the proper name for this defendant, namely "Municipality of Kingston."

under the Pennsylvania Human Relations Act. Defendants contend that plaintiff failed to establish that he has a disability as defined under the ADA and that he failed to establish a prima face case of retaliation. Defendants also contend that plaintiff cannot show that their proffered reasons for his failure to get a promotion to detective were a pretext for discrimination due to any disability or for retaliation.

Based upon the court's review of the motion and related materials, defendants' motion for summary judgment will be **GRANTED** with respect to the plaintiff's federal claims, Count II. The court will decline to exercise supplemental jurisdiction over the plaintiff's common law retaliation claim, Count I.

## I.   MATERIAL FACTS[2]

### 1. Work Injury

For over 12 years, the plaintiff has been employed as a police officer for the Municipality of Kingston. On June 8, 2015, plaintiff was injured while working as a senior patrolman when he twisted his left knee while exiting his patrol car. Plaintiff went to MedExpress, a workers' compensation panel clinic, and he was cleared to return to duty, with restrictions on kneeling and bending.

---

[2]The material facts are derived from defendant's statement of facts, the plaintiff's response, and the exhibits filed by both parties. The court only includes facts material to the issues in the case, and it does not include legal conclusions.

On June 15, 2015, plaintiff had a follow-up visit with MedExpress. Following this visit, MedExpress sent Kingston a medical note stating that plaintiff was released to full duty work with no restrictions.

Plaintiff then returned to full-time, full-duty work through July 14, 2015, when he returned to MedExpress regarding his left knee. He was placed on modified work duty for two weeks, until his follow-up appointment. Soon thereafter, plaintiff advised Kingston that he suffered a torn meniscus from his June 8th injury, and that he was having surgery in August on his left knee, by Dr. Raklewicz of Orthopaedic Consultants, to repair his meniscus tear. Police Chief Mike Krzywicki requested plaintiff to periodically check in with Kingston to keep it apprised of his medical status.

Plaintiff had surgery on August 19, 2015. Dr. Raklewicz did not have to remove the meniscus in plaintiff's left knee since it was not torn to the extent originally thought. After his surgery, plaintiff remained out of work until his follow-up visit with Dr. Raklewicz on September 21, 2015.

Also, in August of 2015, plaintiff filed a claim for workers' compensation benefits, and it was approved. As such, plaintiff received compensation at all times when he was out of work through Heart and Lung benefits under Pennsylvania Law.

At his September 21, 2015 appointment, Dr. Raklewicz gave plaintiff a note which excused him from working until his next follow-up appointment on October 12, 2015, and plaintiff sent the note to Kingston.

In October of 2015, plaintiff was contacted on a number of occasions

by his superior, Police Chief Mike Krzywicki, and by Kingston employee Sondra Ravello about his medical condition and they inquired when he could return to work. He stated that the Chief called him about twice a week and after his doctor appointments and, that Ravello called him four times. Plaintiff testified that the Chief wanted him to return to work on light duty but he told the Chief that his personal doctor, Dr. William Krywicki, had not released him to return to work. Plaintiff then asked Chief Krzywicki to stop contacting him about when he could go back to work. He did not receive any further calls about this matter.

There is no evidence that then Mayor James Haggerty, was involved with either the Chief's or Kingston's request that plaintiff return to light duty work or that he tried to get a release to perform light duty work from Dr. Raklewicz. Nor is there any evidence that Haggerty directed either Chief Krzywicki or Ravello to contact him about the plaintiff's returning to work on light duty. In fact, there is no evidence that Haggerty was even aware that the Chief and Ravello were contacting plaintiff.

Following his October 12, 2015 appointment, Dr. Raklewicz medically cleared plaintiff to return to work "full duty/no restrictions." Kingston officials then attempted to contact plaintiff to schedule his return to work. However, the Kingston officials were unable to contact plaintiff and he did not return their phone calls.

Plaintiff did not return to work after Dr. Raklewicz released him to full duty work. Rather, plaintiff went to Dr. James Gallasso for a second opinion

4

regarding his left knee. On October 14, 2015, Dr. Gallasso issued a note stating that plaintiff was not cleared to return to work for Kingston for another four weeks.

No disciplinary action was taken against plaintiff by Kingston for not returning to work as permitted by Dr. Raklewicz, and it allowed plaintiff to remain out of work until his follow-up appointment with Dr. Gallasso.

On November 13, 2015, Kingston sent a modified duty description regarding plaintiff to his personal physician, Dr. Krywicki, for review in order to determine if plaintiff could be released to return to duty with modified restrictions. Dr. Krywicki refused to release plaintiff to return to work in any capacity and requested that Kingston excuse him from work until December 14, 2015. On January 20, 2016, Dr. Krywicki issued a Return to Duty Note releasing plaintiff to full duty work.

Kingston's workers' compensation carrier then scheduled plaintiff for an Independent Medical Examination ("IME"). Dr. David Cooper performed the IME on January 26, 2016, and concluded as follows: "I certainly agree with his other treating doctors that he is able to return to work as a police officer full duty without restrictions, although he might occasionally complain of some soreness in his left knee from time to time."

Plaintiff testified that after he returned to work he still had temporary issues with his left knee, such as a little pain that lasted for about 3 to 4 months and he could not initially run full stride.

## 2. Police Detective Position

The promotion of police officers with Kingston Municipal Police Department ("KMPD") was governed by the Civil Service Rules and Regulations which were issued by Kingston's Civil Service Commission on May 20, 2015. (Doc. 16-1 at 34-57). The Civil Service Rules and Regulations require all applicants for promotion to take a written and oral examination, "with the written examination representing seventy percent (70%) of the final score and the oral examination representing thirty percent (30%) of the final score." Once all applicants have completed the written and oral examinations, the Commission ranks all "passing applicants on a list with the applicant receiving the highest score at the top of the list and the applicant receiving the lower passing score at the bottom of the list." The eligibility list is valid for a period of 12 months from the date of formal adoption, although it can either be voided at any time by the Commission, or extended for a maximum period of one additional year.

The Civil Service Rules and Regulations state that the Mayor of Kingston "may fill any vacancy in an existing position in the Police Department."

Under Kingston's Civil Service Rules and Regulations, the procedures for police promotions were as follows:

5.2 Appointment

> (b) [E]very position, except that of the Chief of Police, Assistant Chief of Police, Fire Chief or Deputy Fire

6

Chief, shall be filled only in the following manner:

1. The Mayor of Kingston shall notify the Commission of any vacancy which is to be filled and shall request the certification of three (3) names from the list of eligible persons.

2. If three (3) names are not available, then the Commission shall certify the name(s) remaining on the list.

3. The Mayor shall make an appointment from the certified list with reference to the merits and fitness of the applicants. However, for initial appointments to the position of Police Officer or Fire Fighter when one of the applicants on the certified list is a Veteran, that applicant shall be selected.

Kingston's Civil Service Regulations had a provisions stating that it was Kingston's and the Commission's "policy to grant equal employment opportunities to qualified persons without regard to race, religion, color, national origin, gender, age, marital status or non-job related physical or mental handicap or disability."

Notably, Kingston's Civil Service Regulations did not contain any requirement that a candidate who was placed on an eligibility list for an open position based on his Civil Service score be given an interview prior to the selection for the position. Nor did the Civil Service Regulations contain any criteria which the Mayor had to follow in selecting a candidate for an open position in the KMPD. The Civil Service Regulations provided that the Civil Service Commission certifies a list of the top three candidates and the Mayor then selects from that list. However, the Civil Service Commission had requirements for the candidates before they were put on the list and, it

conducted written testing and oral interviews.

In January of 2016, a vacancy was open for the position of detective with the KMPD. The detective division's primary role is initiating investigations into potential criminal wrongdoing, and following through with the investigations until an arrest is made.

The KMPD indicated its intent to fill the open vacancy for the detective position. The Mayor of Kingston at the time was defendant James Haggerty, and he notified the Civil Service Commission of the vacancy and requested that the Commission certify three names for consideration to the position. The Commission provided Haggerty with a certified list of police officers eligible for promotion to detective as of March 10, 2015. This list was valid until March 10, 2016.

The three officers, in order of eligibility for promotion to detective, were:

1. Thomas McTague, score 71.26

2. George Kocher, score 71.15

3. John Anthony, score 69.86.

On January 15, 2016, while plaintiff was still off from work due to his knee injury, he learned that KMPD had a vacancy for a detective position. Plaintiff was second on the list of three certified applicants for the position. Also, on January 15, 2016, plaintiff received a text message from former KMPD police officer and detective Ian Urbanski, who worked for KMPD from May of 2005 to January of 2016, stating, "They're giving promotional interviews to Mctague (sic) and Anthony today. It's messed up if they didn't

call you." (Doc. 19-5). Plaintiff testified that both McTague and Anthony told him that he were interviewed for the detective position.

Under Section 5.2(b) of the Civil Service Rules and Regulations, Haggerty had the final authority to fill the detective position from the stated three applicants, based on the merits and fitness of the applicants. Haggerty reviewed each officer's performance as police officers, including their work in conducting criminal investigations and their arrest statistics from 2013 through 2015.

The Criminal Statistics for each applicant were as follows:

| Criminal Statistics: | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|
| McTague: | 9 Criminal | 19 Criminal | 20 Criminal | 48 |
| Kocher: | 3 Criminal | 5 Criminal | 2 Criminal | 10 |
| Anthony: | 33 Criminal | 32 Criminal | 21 Criminal | 86 |

Officer Anthony's criminal statistics were considerably higher than McTague's and plaintiff's over the 3-year period.

Although all eligible applicants received interviews in the past for open positions, plaintiff was not given an interview and he was not offered the position of detective, which would have been a promotion. Plaintiff testified that he had the right to be interviewed for the detective position, but he also admitted that the selection of the officer for the position was within Haggerty's discretion. Plaintiff also testified that he thought defendants retaliated against him by not promoting him to detective based on his filing a workers' compensation claim and, because he was still out of work when the detective

9

position became open and he would not return to work on light duty as Kingston had requested.

On January 18, 2016, Haggerty sent a Memorandum to Anthony advising him that he was awarded the detective position.

On January 20, 2016, plaintiff discovered that Anthony received the detective position even though Anthony was third on the list of certified applicants.

Haggerty testified that he was first elected as Mayor of Kingston in January of 1988 and that he then served for five terms as Mayor. He stated that during his long tenure as Mayor, he appointed individuals to detective positions "many times." Haggerty also appointed police officers to KMPD, including plaintiff, during his 20 years as Mayor. Haggerty did not remember if he always interviewed the top three candidates every time there was a position open with KMPD.

Haggerty also testified that the number of criminal arrests made by a patrolman was an indication as to whether that patrolman would be a good detective, but that the number of arrests was only one of several factors he considered and he was well aware that any arrest quotas for police officers was unlawful. He explained as follows:

> Patrolman get called out for all sorts of things. They get called, they get called to businesses for shoplifting cases. They get called to houses for domestic cases. And some patrolmen are good detectives, and they work their own cases, and they follow up on what they find out, and they solve the crimes and make the charges and make the arrests. Other patrolmen pass the cases

off to the detective division. So a patrol officer who showed as a patrol officer that he had good instincts as a detective, and made arrests on his own cases, and didn't just pass them off, and followed up on them, that was something we would look upon favorably [during the detective selection process].

Haggerty also described his process regarding his selection of the detective for the January 2016 opening and the process he used to evaluate McTague, Kocher and Anthony. Haggerty stated that he spoke to McTague about the detective position "because I always thought that the person who is first on any list, be it an initial hire list, a promotional list, a fire list or police list, I thought that the person who was first deserved some courtesy." Haggerty testified that when he made promotional decisions he did not strictly go by the list and that he considered where people best fit in the police department.

Next, Haggerty explained his process as follows:

[ ] I relied on the [Kingston] Manager, Paul Keating. I had a conversation with Paul Keating, who was there every day, whose office door is about 15 feet from the police station, about what his opinion on [the open detective position] was. I spoke to the police chief about what his opinion on this was. I have a recollection of speaking with Detective Kotchik, who I hold in high regard as a criminal investigator in asking what his opinion was. I looked at whatever information was given to me by the Civil Service Commission. And I don't remember in this case if we had the files or not, but usually we have the, we have the files of the process, and I go through the file, the files that are accumulated. I was aware of the [above stated Criminal Statistics]. And based on all of those criterion, it was my belief that Sergeant McTague, it was better for the department that Sergeant McTague remain as a patrol sergeant. And I thought that as between Officer Kocher and Office Anthony, Officer Anthony was a proper candidate for criminal detective.

11

Haggerty also testified that after he spoke to Keating, Keating felt that Anthony would be the best criminal detective out of the candidates. Haggerty further stated that Keating "shared my view, that McTague [ ] would be an excellent detective" since "[he] is a smart, talented, and motivated police officer, but he was needed in uniform as a patrol sergeant." Haggerty then stated that he discussed the plaintiff with Keating and Haggerty testified:

> The general perception of Officer Kocher, and not to be rude about Officer Kocher, was that Officer Kocher had a reputation in the Department as lazy, as unmotivated, as not productive. That was [ ] the reputation and that was the information that was generally shared by the people that I had spoke with.

Haggerty was also advised that over time plaintiff had demonstrated a deterioration in his performance as a police officer and that he had become "less motivated, less productive and, lazier." Haggerty explained that despite the number of traffic citations plaintiff had issued, that was not a factor he considered important in selecting a detective. Rather, he stated that the important factors in selecting a detective were a patrol officer's history of charging, by filing criminal complaints, and prosecuting criminal cases, and whether the officer followed up on a case, was diligent in investigating the case, and if he brought the case to conclusion.

Haggerty also discussed the detective position with Chief Krzywicki and the Chief stated that he preferred Anthony to be the detective. The Chief further indicated that Anthony would be a better criminal detective than plaintiff. Additionally, Detective Kotchik recommended to Haggerty that Anthony be promoted to the detective position, and Kotchik told Haggerty that

12

Anthony was "excellent detective material" and was talented enough to work in the drug division which is the most demanding division in the KMPD. Further, Haggerty stated that even if plaintiff's score was slightly higher than Anthony's, there was a substantial difference in the initiative and motivation shown by Anthony compared to plaintiff.

Haggerty testified that pursuant to the Civil Service Ordinance, the Mayor has the authority to select a successful candidate for a promotion from among the top three candidates. He also stated that he knew plaintiff had some type of injury and had been out of work, but he did not know how much time from work plaintiff missed. Nor did Haggerty know if plaintiff's injury was referred to Kingston's workers' compensation insurance carrier. Haggerty further stated that he did not give any direction regarding plaintiff's workers' compensation issues, such as any requests that plaintiff try to get released to perform light duty work.

Haggerty testified that he based his decision regarding the promotion to the detective position on his evaluation of the performance of the candidates as was reported to him by Kingston's professional staff. As such, he appointed Anthony to fill the vacant detective position with KMPD effective February 1, 2016.

After Urbanski left KMPD in January of 2016 to work as an agent for the Pennsylvania Attorney General's Office, his detective position, which is at issue herein, became open. Urbanski testified that based on his experience from "four or five previous processes [he went through]", he was "under the

13

impression that the top three candidates would be interviewed" as part of the selection process for an open position. Urbanski stated that "although [he was] not totally familiar with the procedures", when he applied for three new positions with KMPD he "always was interviewed." However, he stated that the top candidate did not always get the position and that the promotion "was based on past performance" of the candidate. In fact, Urbanski testified that on at least two occasions he was passed over for a promotion to detective and sergeant when he was number one on the civil service list. He further stated that despite the fact that he scored over 20 points higher on the civil service test than the other eligible candidates on the list, he was not selected for the position. Urbanski verified that when Haggerty made a selection for a promotion in the KMPD he discussed the matter with the police Chief and the police Captain.

Former KMPD police office and current detective Stephen Gibson testified that every time he went through the process of applying for an open position with KMPD, the top three eligible candidates on the Civil Service list for the position received an interview. With respect to positions with KMPD that he did not apply for, he stated that to his knowledge the top three candidates for open positions with KMPD were always interviewed except for plaintiff regarding the detective position at issue. Gibson also stated that he knew of instances in which the highest ranking eligible candidate on the list was passed over for a promotion. In particular, Gibson stated that even though he was number two on the list for a detective position, he was selected

to the position over Urbanski who had scored higher on the Civil Service test than he did.

Additionally, neither Urbanksi nor Gibson had any knowledge whether Kingston did not interview plaintiff for the detective position even though he ranked second on the list of candidates as retaliation for having filed a workers' compensation claim after his left knee injury.

When plaintiff was asked at his deposition why he alleged that Haggerty passed him over for the detective promotion as retaliation because he was out of work on workers' compensation, he replied "I have no idea, because I have never talked to Mayor Haggerty about any of this. I don't know who he talked to that could be anybody, anyone of the people that's mentioned there in the administration." Additionally, plaintiff admitted that the promotion for an open position with the KMPD "didn't always have to go to number one [on the promotion list of eligible candidates] because they could pick and choose from the top three if there was one position available." Plaintiff then admitted that he based his retaliation claim against the defendants on the fact that he was not given an interview for the detective position.

Even though Sergeant McTague's score on the Civil Service test was higher than plaintiff's and Anthony's scores and, even though McTague held a supervisory position and ranked first on the promotional list, he was not selected by Haggerty to fill the detective position. Nor did Haggerty offer McTague the detective job despite the fact that he was first on the Civil service list for the position. Further, McTague's criminal statistics from 2013-

2015 were almost five times higher than plaintiff's. Although plaintiff testified that McTague was offered the detective position, he based this testimony on his belief that Urbanski had told him this and on Anthony's text message to him stating that McTague told him (Anthony) that "he wasn't taking [the detective position]." However, McTague was not offered the detective position and, McTague never told plaintiff that he was offered the position. Rather, Haggerty spoke to McTague about the detective position and explained to McTague that he was needed more by KMPD as Sergeant. McTague understood Haggerty's rationale for not offering him the detective position.

### 3. Plaintiff's Return to Work

On January 25, 2016, plaintiff returned to work as a senior patrolman with KMPD when he was released to full duty by Dr. Krywicki.

After he returned to work, plaintiff did not miss work due to an illness or injury other than for a cold, flu, and similar temporary illnesses.

Plaintiff testified that after he was unable to work due to his June 2015 knee injury, until he went back to work in January of 2016, he did not have any discussions with Haggerty regarding the fact that he was out of work. He also admitted that as of August 2015, he never had any issues with Haggerty.

From the time that he was released to return to work by Dr. Krywicki in January of 2016, until the time of his deposition on August 14, 2018, plaintiff testified that he had not required any further treatment for his left knee. He also admitted that he does not suffer any disability related to his left knee and,

that he has not had any problems with his left knee since he was released to work by Dr. Krywicki. Further, plaintiff testified that his left knee does not cause him any problems with respect to the performance of any of his daily activities.

Since plaintiff was a unionized employee and subject to the provisions of the Collective Bargaining Agreement ("CBA") between the employees of the KMPD and the Municipality of Kingston, he filed a grievance under the CBA on February 8, 2016. Plaintiff alleged that the Civil Service Rules and Regulations, the Home Rule Charter, and the KMPD contract were violated with respect to the process for selecting the detective position. Specifically, in his grievance, plaintiff stated:

> While being out on workmans Comp, and placed #2 on the Certified List for Detective, I learned through an e-mail a promotion to Detective was given and this position was filled. I was informed the Position of Juvenile Detective was going to be opened for Promotion and that #1 and #3 candidates on the Certified List did not want the Position, I was informed that interviews were held for Criminal Detective, I did not get asked or receive any notification to come in for an interview when #1 and #3 Candidates received interviews.

As relief in his grievance, plaintiff requested "Placement in Detection (sic) Position."

On February 10, 2016, Chief Krzywicki denied plaintiff's grievance in a letter to plaintiff. The Chief also advised plaintiff that "If you are not satisfied with my decision, you are entitled to move the Grievance to the next step pursuant to the Collective Bargaining Agreement."

17

Plaintiff did not appeal the Chief's denial of his grievance as he could have under the CBA.

On June 24, 2016, plaintiff filed a Charge of Discrimination against Kingston with the Equal Employment Opportunity Commission ("EEOC") alleging that he did not receive an interview and did not receive the detective position that he should have received based on his alleged left knee disability and based on his claim for workers' compensation benefits.

On August 21, 2016, plaintiff's EEOC Charge was denied.

## II.    PROCEDURAL BACKGROUND

In his amended complaint, (Doc. 1-1 at 13-19), removed to this court on November 20, 2017, the plaintiff asserts two counts, namely: Count I, a common law retaliation claim alleging that defendants retaliated against him for filing his claim for workers' compensation benefits by failing to interview him and to promote him to detective; Count II, disability discrimination and retaliation under the Americans with Disabilities Amendments Act,[3] ("ADAAA"), 42 U.S.C. §12112, and §12203, under the Pennsylvania Human

_____

[3]Plaintiff cites to the ADA Amendments Act of 2008 which expanded the scope of disability and construed the definition of disability in favor of broad coverage. 42 U.S.C. §12102(4)(A). Since all of plaintiff's claims arose after January 1, 2009, the effective date of the ADAAA, the new standard governs his claims. *See* Rocco v. Gordon Food Serv., 998 F.Supp.2d 422, 428 (W.D.Pa. 2014).

Relations Act, ("PHRA"), 43 P.S. §951, *et seq*.[4] Plaintiff alleges that defendants violated the stated federal and state laws by engaging in disability discrimination when they failed to interview and hire him for the detective position. Plaintiff also raises retaliation claims against defendants under the ADAAA and the PHRA alleging that they retaliated against him for requesting a reasonable accommodation after his work related injury.

On November 2, 2018, defendants filed a motion for summary judgment regarding all of plaintiff's claims in his amended complaint pursuant to Fed.R.Civ.P. 56. (Doc. 15). Defendants simultaneously filed their statement of material facts with exhibits, (Doc. 16), and their brief in support, (Doc. 17). Plaintiff filed his responses to defendants' statement of material facts with exhibits on November 9, 2018, (Doc. 19), and his brief in opposition. (Doc. 18).

This court's jurisdiction over the plaintiff's federal claims is based on 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. §1337.

---

[4]The substantive standards for determining liability regarding retaliation and discrimination claims are the same under the ADA and the PHRA. *See* Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)) (the "analysis of an ADA claim applies equally to a PHRA claim."). As such, the court will discuss the plaintiff's disability discrimination and retaliation claims under the ADAAA and the PHRA together. The resolution of plaintiff's disability discrimination and retaliation claims under the ADAAA will be dispositive with respect to his PHRA claims. *See* Bialko v. Quaker Oats Co., 434 Fed.Appx. 139, 142 (3d Cir. 2011); Gardner v. Sch. Dist. of Philadelphia, 636 Fed. Appx. 79, 85 (3d Cir. 2015).

## III.    DISCUSSION[5]

### *A.    Legal Standard for Plaintiff's Federal Claims*

The court will first discuss plaintiff's federal ADAAA retaliation and disability discrimination claims raised in Count II of his amended complaint.

The burden-shifting framework in [McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),](#) applies to the plaintiff's retaliation and discrimination claims under the ADAAA. *See* Gavurnik v. Home Properties, L.P., 227 F.Supp.3d 410, 416 (E.D.Pa. 2017), aff'd. 712 Fed.Appx. 170 (3d Cir. 2017); Williams v. Phil. Hous. Auth. Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (citation omitted); Wells v. Retinovitreous Associates, Ltd., 702 Fed.Appx. 33, 35 (3d Cir. 2017).

The court in Decker v. Alliant Technologies, LLC, 871 F.Supp.2d 413, 425 (E.D.Pa. 2012), explained the *McDonnell Douglas* burden-shifting framework as follows:

> If the plaintiff establishes a prima facie case of [retaliation or] discrimination, then an inference of discriminatory motive arises and the burden shifts to the employer to articulate a legitimate, [nonretaliatory] nondiscriminatory reason for the adverse employment action. *See* Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998). If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason is merely pretext for intentional discrimination. Makky, 541 F.3d at 214. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against

---

[5]Since the proper standard regarding a summary judgment motion under [Fed. R. Civ. P. 56(c)](#) is stated in the briefs of the parties, the court does not repeat it herein. *See also* [Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)](#); [Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990)](#).

the plaintiff remains at all times with the plaintiff." *See* <u>Williams v. Phila. Housing Auth. Police Dep't</u>, 380 F.3d 751, 759 n. 3 (3d Cir. 2004) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

"The burden to establish a prima facie case is a not an onerous one, but a prima facie case can allow a court 'to eliminate the most obvious, lawful reasons for the defendant's action.'" *Id*. (citing <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999).

### B. Retaliation Claims

In Count II, plaintiff alleges that defendants retaliated against him after he requested a leave of absence in August of 2015 due to his medical condition related to his work related injury. Specifically, he alleges that defendants retaliated against him for requesting a reasonable accommodation after his injury and for filing a workers' compensation claim, and for requesting a medical leave of absence by harassing him to return to work on light duty and by not interviewing and hiring him for the detective position.

At the outset, in Count II, plaintiff seeks compensatory and punitive damages as relief, as well as lost wages and front pay. However, insofar as plaintiff seeks compensatory and punitive damages with respect to his ADAAA retaliation claim, "this Court will not depart from the long line of District Court cases within [the Third Circuit] that have consistently held that, with respect to a retaliation claim brought pursuant to the ADA, a plaintiff cannot recover compensatory damages." <u>Keating v. Pittston City Hous. Auth.</u>, 2018 WL 1414459, at \*6 (M.D.Pa. Mar. 21, 2018) (citing <u>Sabbrese v. Lowe's</u>

21

Home Centers, Inc., 320 F.Supp.2d 311, 332 (W.D.Pa. 2004) ("since compensatory and punitive damages are not available, the sole remedy for plaintiff's retaliation claims pursuant to the ADA is equitable relief."). As such, plaintiff's request for compensatory and punitive damages regarding his ADAAA retaliation claim in Count II is dismissed with prejudice.

"To establish a prima facie case of unlawful retaliation in violation of the ADA [and the PHRA], a plaintiff must show that he engaged in protected activity, that he suffered adverse action either after or contemporaneous with the protected activity, and that there was a causal connection between the employee's protected activity and the employer's adverse action." Canevari v. Itoh Denki U.S.A., Inc., (M.D.Pa. July 24, 2017) 2017 WL 4080548, *13 (citations omitted), adopted by 2017 WL 4077394 (M.D.Pa. Sep. 14, 2017); Gavurnik, 227 F.Supp.3d at 420.

Under the ADA, employers are prohibited from retaliating against their employees for engaging in a protected activity such as requesting reasonable accommodation for their disability. *See* Oden v. SEPTA, 137 F.Supp.3d 778, 787 (E.D.Pa. 2015). "An employer's denial of a request for a reasonable accommodation is a discrete act of discrimination that is an independently actionable unlawful employment practice under the ADA." *Id*. (quoting Mercer v. Southeastern Pennsylvania Transit Authority, 26 F.Supp.3d 432, 442 (E.D.Pa. 2014), aff'd. 608 Fed.Appx. 60 (3d Cir. 2015)). Further, "the ADA expressly defines an actionable act of discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability,' which means that failure to accommodate is a separately actionable 'unlawful employment practice' akin to wrongful termination or failure to hire." Mercer, 26 F.Supp. 3d at 442 (citing 42 U.S.C. §12112(b)(5)(A)). *See also* Barber v. Subway, 131 F.Supp.3d 321, 329 (M.D.Pa. 2015) ("It is well-settled that adverse employment decisions under the ADA include an employer's failure or refusal to reasonably accommodate an individual's disability.").

Next, the court finds that the failure to promote plaintiff to detective is an adverse employment action. However, the discretionary failure to interview, which was neither statutorily or contractually required was not. Plaintiff testified that the pay difference between his position as a senior patrolman with KMPD and the detective position was about $1500 to $2000 per year plus the 8% night shift differential if a detective worked after 2:00 p.m. In Wells v. Retinovitreous Assoc., Ltd., 702 Fed.Appx. 33, 36 n. 14 (3d Cir. 2017), the Third Circuit noted that the correct standard in identifying an adverse employment action regarding a retaliation claim is "the less restrictive [Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006)] standard, under which 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" "Determinations about whether acts are materially adverse or simply part of a normal workplace 'depend on the totality of the circumstances', and "a discrimination analysis

must concentrate not on individual incidents, but on the overall scenario." Boandl v. Geithner, 752 F.Supp.2d 540, 561 (E.D.Pa. 2010) (internal citations omitted).

In applying the Burlington standard to the facts of this case as required, the court finds that plaintiff has sufficiently shown an adverse employment action with respect to his retaliation claim. *See* Hill v. Branch Banking and Trust Company, 264 F.Supp.3d 1247, 1260 (N.D.Al. 2017) ("failure to promote an employee is also an adverse action [regarding an ADA claim]." (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. at 761, 118 S.Ct. 2257 (1998) ("In the context of this case, a tangible employment action would have taken the form of a denial of a raise or a promotion.").

Here, the protected activity occurred in August of 2015 when plaintiff requested a reasonable accommodation seeking a leave of absence from work due to his medical condition from his left knee injury. The alleged adverse action of defendants came after his request when he claims they harassed him to return to work on light duty and, when they failed to hire him for the detective position which became open in January of 2016.

Initially, there is no evidence that Haggerty ever harassed plaintiff to return to work with KMPD on light duty after his knee surgery. In fact, Haggerty did not even know the specific times when plaintiff was out of work due to his knee injury and surgery. Plaintiff only stated that two Kingston officials, namely, Chief Krzywicki and Ravello, harassed him to return to work. Nor is there any evidence that Haggerty decided not to interview nor promote plaintiff to the detective position because he would not return to work on light

duty. Additionally, there is no evidence that Haggerty directed either the Chief Krzywicki or Ravello to contact plaintiff when he was out on medical leave, and there is no evidence that Haggerty was even aware that the Chief and Ravello were contacting plaintiff. Since neither the Chief nor Ravello had any authority with respect to the determination of whether plaintiff received an interview nor was hired for the detective position, there was no causal connection between plaintiff's request for reasonable accommodation, the alleged harassment, and the failure of plaintiff to receive the detective position. Further, plaintiff was not forced to return to work on light duty despite the alleged harassment and he was allowed to remain off of work, receiving compensation under the Pennsylvania Heart and Lung benefits, until January 25, 2016, when he was released to full duty by Dr. Krywicki. Thus, the alleged harassment  after plaintiff's request for a reasonable accommodation cannot be the basis for his ADAAA retaliation claim against defendants.

Moreover, the undisputed evidence shows that there was no causal connection between plaintiff's request for a reasonable accommodation and the failure of Haggerty to interview and hire him for the detective position. Despite plaintiff's evidence in the form of Urbanski's and Gibson's testimony that to their knowledge when there was an open position with KMPD the top three candidates always received interviews, Haggerty could not recall if he always interviewed the top three candidates during his 20 years as Mayor. Further, there was no requirement in the Kingston Civil Service Rules and Regulations requiring an interview for the candidates. There is also no dispute that the selection of police officers and the promotion of officers was within

the sole discretion of the Mayor. As detailed above, Haggerty explained the in-depth investigatory process he used when the detective position became open and, he explained why he believed Anthony would make a better detective than plaintiff despite plaintiff's ranking marginally above Anthony. The evidence shows that plaintiff's request for a reasonable accommodation and his being out of work due to his knee injury played no part in Haggerty's decision as to who he would promote to detective.

To the extent plaintiff contends that his filing for Pennsylvania Workers' Compensation benefits was the protected activity with respect to his ADAAA retaliation claim, the court in Keslosky v. Borough of Old Forge, 66 F.Supp.3d 592, 631-31 (M.D.Pa. 2014), explained:

> "[T]he Pennsylvania Supreme Court held that a cause of action exists under Pennsylvania law for wrongful discharge of an employee who files a claim for workers' compensation benefits [and a]lthough the Pennsylvania courts have yet to enumerate the elements of this cause of action, several federal district courts in Pennsylvania have analogized this cause of action to a retaliatory discharge claim under Title VII", an approach the Third Circuit has approved. Dunsmuir v. May Dept. Stores Co., 120 Fed.Appx. 927, 929 (3d Cir. 2005).

Assuming *arguendo* that plaintiff's filing of his claim for workers' compensation benefits is a protected activity, and the failure to get an interview and the promotion are the adverse employment actions, plaintiff has not established a causal connection between the filing of the claim and the actions of defendants. There is no evidence that Haggerty failed to promote him to the detective position as retaliation because he was out of work on workers' compensation. Indeed, Haggerty testified that he knew plaintiff had some type of injury and had been out of work, but he did not know how much

time from work plaintiff missed. Haggerty also did not know if plaintiff's injury was referred to Kingston's workers' compensation insurance carrier. In fact, plaintiff admitted that after his left knee injury and he went out of work in August of 2015 until he returned to work in late January of 2016, he did not have any discussions with Haggerty regarding the fact that he was out of work. Plaintiff also conceded that as of August of 2015, he "never had any issues with [Haggerty]." Since Haggerty was the sole decision maker as to who was interviewed and selected for the detective position, plaintiff failed to make out a prima facie case of retaliation under the ADAAA based on his filing of a claim for workers' compensation benefits.

Moreover, even if the plaintiff established a prima facie case of ADAAA retaliation based on any of his allegations, defendants have met their burden and provided a legitimate, non-retaliatory reason for their actions, i.e., not interviewing and promoting plaintiff. In particular, Haggerty considered all three candidates, conducted an investigation, and explained why he felt Anthony would make a better detective than plaintiff. He specifically considered Anthony's motivation and investigation skills as well as his work ethic, which he found superior to plaintiff's. He also considered the opinions of the stated Kingston officials. Further, Haggerty stated that even though he originally hired plaintiff about 12 years earlier to be a police officer with KMPD, his investigation revealed that plaintiff had become lazy and less motivated over the years. He also did not find the number of citations plaintiff issued to be a significant factor when evaluating which candidate would make the best detective since the factors he found to be important were the candidates'

investigatory skills, ability to take a criminal case from inception to conclusion by their own initiative, and their performance in making the citizens of Kingston safe.

"If the employer provides [a legitimate, non-retaliatory reason for its conduct], the plaintiff must then 'be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Keslosky, 66 F.Supp.3d at 631 (citations omitted). In order to show pretext, "the employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). In order to "discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id*. at 765. Moreover, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' [Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)], and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)." Billet v. CIGNA Corp., 940 F.2d 812, 825

(3d Cir. 1991), *overruled in part on other grounds*, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).

The defendants argue that the plaintiff has failed to establish by a preponderance of the evidence that their proffered legitimate, non-retaliatory reasons for failing to interview and promote plaintiff were pretextual. They state that the undisputed evidence shows that "Haggerty, as the sole decision maker on the promotions played no role in [plaintiff's workers'] compensation case", and Haggerty provided multiple non-retaliatory reasons for his selection of [Anthony]" for the detective position.

To show that defendants' reasons were a pretext for retaliation, plaintiff relies upon the testimony of Gibson and Urbanksi who both stated that every time they went through the process for an open position in KMPD the top three eligible candidates on the Civil Service list would get interviews. He also points to the fact that McTague and Anthony received interviews. Plaintiff argues that the failure of defendants to follow their normal policies and procedures when they selected Anthony for the detective position shows that their reasons why he was not chosen are pre-textual.

The court has considered above the evidence upon which plaintiff relies to show pre-text, and found that despite this argument there was no evidence to support a causal connection between plaintiff's request for reasonable accommodation and the filing of his workers' compensation claim and the failure of Haggerty to interview and hire him for the detective position. The plaintiff has failed to produce evidence that a retaliatory animus motivated Haggerty. There is a complete absence of evidence in this case showing that

Haggerty was motivated not to interview and promote plaintiff to detective due to his request for reasonable accommodation and his filing for workers' compensation benefits. As discussed, when plaintiff was out of work, Haggerty was not aware of the specifics regarding his knee condition, his medical issues pertaining to his knee, and his claim for workers' compensation benefits. Plaintiff has failed to offer sufficient evidence from which a fact finder could reasonably conclude that the adverse employment decisions taken against him by defendants were a result of retaliation. Even if Haggerty's stated perception of plaintiff's work performance was not correct, this would not be sufficient to show his decision not to promote plaintiff was a pre-text for retaliation. Thus, under the Fuentes test, the court finds that the totality of the evidence in the record is not sufficient to permit a reasonable jury to conclude that the defendants' proffered non-retaliatory reasons as to why plaintiff was not interviewed and promoted to detective were pre-textual for retaliation.    Therefore, the court will grant defendants' motion for summary judgment with respect to plaintiff's ADAAA retaliation claim in Count II of his amended complaint.

### C.    *Disability Discrimination Claims*

Plaintiff also claims that defendants discriminated against him "because of his medical condition when they failed to hire him for the open position of detective when they selected the [third] ranked individual over him." The medical condition to which plaintiff refers is his left knee injury.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). To establish a prima facie case of disability discrimination under the statute, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)). The ADA defines a "disability" with respect to an individual as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. §12102(1).

Thus, to establish a "disability" under the ADA, plaintiff must prove that he is substantially limited in performing a major life activity. *See* 42 U.S.C. §12102. As noted, the ADAAA expanded the scope of disability and construed the definition of disability in favor of broad coverage. Nonetheless, the ADAAA's definition of "disability" still remains as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. §12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). "The determination of whether an individual is

substantially limited in a major life activity must be made on a case by case basis." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 566, 119 S.Ct. 2162 (1999) (citation omitted).

Further, with respect to the "'physical or mental impairment' prong of the definition of a disability, EEOC regulations clarified that 'the determination of whether an impairment substantially limits a major life activity requires an individualized assessment' and 'should require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Riley v. St. Mary Medical Center, 2014 WL 220734729, *2 (E.D.Pa. May 28, 2014) (citations omitted). However, "[n]ot every impairment will constitute a disability" within the meaning of the ADA. Koller v. Riley Riper Hollin & Colagreco, 850 F.Supp. 2d 502, 513 (E.D.Pa. 2012). Under the ADAAA, the qualifying impairment must still create an "important" limitation. Id.

"To determine whether [plaintiff] is disabled under Subsection (A), we 'must first identify the specific life activities that [plaintiff] claims are affected and determine whether those activities are 'major life activities' under the ADA, and then must evaluate whether [plaintiff's] impairment substantially limits those major life activities." Parrotta v. PECO Energy Company, 363 F.Supp.3d 577, 590-91 (E.D.Pa. 2019) (citation omitted). The court "measure[s] disability at the time the adverse action occurred", id. at 591, i.e., when plaintiff was not selected for the detective position.

Here, the plaintiff's claim of disability discrimination in his amended

complaint is based only on an actual disability.[6] Defendants argue that the plaintiff has failed to produce sufficient evidence to establish that he meets the definition of disabled under the ADAA since his medical issues with his left knee did not substantially limit a major life activity. They contend that plaintiff's knee condition was a temporary, non-chronic impairment that was resolved by his surgery and that his condition does not constitute a disability under the ADA. For support, defendants cite to Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002) ("[A] temporary, non-chronic impairment of short duration is not a disability covered by the ADA.") (citation omitted).

Plaintiff points out that for more than 7 months after his knee injury, he was restricted in his work duties and that his knee injury affected his major life activity of walking. There is no dispute that after his knee injury and surgery plaintiff's knee condition temporarily affected his ability to walk and that he was required to be off from work. During this time, plaintiff was allowed to remain off of work, his senior patrolman position was held for him, and he was being paid. He was then cleared to return to full duty work as a police officer with KMPD on January 25, 2016, with no restrictions. Further, plaintiff admitted that after he returned to work he did not miss work for any illnesses or injury except for having colds or the flu. Plaintiff testified that he did not have any other type of physical ailment or condition that affected his ability to work other than his left knee injury. He stated that after he returned to work he no longer required any medical treatment for his left knee. Plaintiff also

---

[6]In his amended complaint, (Doc. 1-1 at 17-91), plaintiff does not allege a "regarded-as" disability claim under the ADA.

testified that he had "no disability" and "no problems" associated with his knee. Further, he stated that his left knee does not cause any problems for him with regard to any of his daily activities.

Although plaintiff testified that he "had a couple of issues with [his knee] after he returned to work on full duty, such as he could not run full stride for 3 to 4 months and he had "a little bit of pain" "but nothing major", he did not have any issues "that kept [him] out of work." He also admitted that there were no activities that he was unable to do when he returned to work, and that there was no permanent injury to his knee.

Despite the broad coverage the ADAAA provides, the court finds that plaintiff has not produced sufficient evidence that he had a disability at the time that he was not chosen for the detective position and that his temporary knee condition did not substantially limit a major life function.

The court finds the instant case very similar to the case of Sampson v. Methacton School District, 88 F.Supp.3d 422 (E.D.Pa. 2015). "In Sampson, the court found the plaintiff failed to raise a genuine issue of fact as to whether she was disabled, explaining the plaintiff failed to show her knee injury [i.e., a tear of her meniscus] was 'a permanent, long term condition.'" Parrotta, 363 F.Supp.3d at 592 (citing Sampson, 88 F.Supp.3d at 436-37) ("An injury like Plaintiff's, involving several months of limitation without long-term or permanent effect, is not a disability under the ADA." (citing Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274-75 (3d Cir. 2012) ("temporary lifting limitations that were removed four months after their inception "are the very definition of such a non-chronic impairment")).

As the court in <u>Parrotta</u>, *id*., explained:

> The plaintiff [in <u>Sampson</u>] had surgery eight months after injuring her knee. After a year recovering from surgery, the plaintiff returned to work. She occasionally wore a knee brace but could "essentially do everything that [she] used to do before [she] was injured." While the plaintiff experienced some discomfort standing, walking, and sitting for long periods of time, the court explained "[m]oderate difficulties in walking or climbing stairs do not bring an individual within the class of persons protected by the ADA."

(citing <u>Sampson</u>, 88 F.Supp.3d at 437). *See also* <u>Brearey v. Brennan</u>, 2019 WL 111037, *6 (E.D.Pa. Jan. 4, 2019) (court found that employee's broken ankle injury caused only "several months of limitations, without long-term or permanent effect" and that despite plaintiff's testimony that he had continued pain, this was not sufficient to establish plaintiff had a disability.").

Additionally, in <u>Parrotta</u>, 363 F.Supp. 3d at 593, the court found that plaintiff failed to create a genuine issue of fact as to whether he had a disability under the ADAAA regarding his plantar plate tear in his left foot even though he had surgery in October of 2016 and did not return to full duty work until January of 2017, since he had no restrictions, no medications and no additional treatments. The court also found that "a plaintiff cannot establish disability relying solely on his own testimony without any medical documentation of his impairment at the time of the adverse action." *Id*. The court stated that "[i]f we allow an employee to establish a disability relying solely on his own testimony, there would be no reasonable limit to a 'disability' under the Disabilities Act." *Id*.

The medical records of plaintiff Kocher following his knee injury at work on June 8, 2015, show that he arthroscopic surgery in August of 2015 to

repair a small tear of his lateral meniscus. However, plaintiff did not have a tear of the medial meniscus and his meniscus did not have to be removed since his knee was "otherwise normal" besides the tear. After his surgery, plaintiff went to physical therapy for his knee. On October 12, 2015, Dr. Raklewicz who performed the surgery and was treating plaintiff for his left knee post-surgery, opined that plaintiff was able to return to work on October 13, 2015, "full duty/no restrictions." However, plaintiff did not return to work, rather, he began intensive physical therapy.

On January 26, 2016, plaintiff had an IME and Dr. Cooper noted that plaintiff was feeling better, that he still had some soreness inside his knee when going up and down stairs, and that the physical therapy was stopped but he was on a home exercise program. Dr. Cooper found that plaintiff's right knee had no synovitis and full range of motion with no weakness of his quadriceps or hamstring. His right patella also tracked normally and he had no joint line tenderness either medially or laterally. Dr. Cooper opined that plaintiff could return to full duty work with no restrictions.

As such, plaintiff's medical records do not show he had an "impairment that substantially limits one or more major life activities" when he was not interviewed and promoted to detective. (Doc. 16-1, at 11-32).

Based on the facts discussed above, the court finds that plaintiff has failed to establish a prima facie case of disability discrimination since he failed to create a genuine issue of material fact as to whether he suffered from a

disability under the ADAAA.[7] Thus, the court will grant defendants' motion for summary judgment with respect to plaintiff's discrimination claim under the ADAAA in Count II of his amended complaint.

Since the same standard applies to plaintiff's retaliation and disability discrimination claims under the ADA and the PHRA, *see* Kelly, 94 F.3d at 105, defendants are also entitled to summary judgment on the claims raised under the PHRA in Count II. *See* Barber, 131 F.Supp. 3d at 330; Ripple v. Olympic Steel, Inc., 2014 WL 509200, at *1 (M.D.Pa. Feb. 10, 2014) ("[O]ur analysis of Plaintiff's ADA claim applies with equal force to his PHRA claim.").

### D.   *State Common Law Retaliation Claim*

Finally, considering judicial economy, convenience and fairness to the litigants, the district court in its discretion is permitted to decline the exercise of supplemental jurisdiction over state law claims if the court has dismissed all of the claims over which it had original jurisdiction. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009) (citations omitted). *See* Patel v. Meridian Health System, Inc., 666 Fed.Appx. 133, 136 (3d Cir. 2016) ("A district court 'may decline to exercise supplemental jurisdiction' over state law claims if it 'has

---

[7]The court notes that the Pennsylvania legislature has failed to enact a an amendment similar to the ADAAA's relaxed standard for disability. Rubano v. Farrell Area School Dist., 991 F.Supp.2d 678, 689 n. 7 (W.D.Pa. 2014) (citing Szarawara v. Cnty. of Montgomery, 2013 WL 3230691, at *2 (E.D.Pa. June 27, 2013) (holding that the PHRA has not been amended like the ADAAA to relax the standard for disability, and therefore, it was necessary to analyze plaintiff's ADA and PHRA claims separately)). Thus, the court must apply the pre-ADAAA disability standard for plaintiff's PHRA claim. Under this standard, the court also finds that plaintiff's evidence regarding how his knee condition substantially limited a major life activity is insufficient as a matter of law to proceed with his disability claim under the PHRA.

dismissed all claims over which it has original jurisdiction[,]' unless considerations of judicial economy, convenience, or fairness to the parties provide an affirmative justification for exercising supplemental jurisdiction.") (citing Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000). The court has made the appropriate considerations and finds no extraordinary circumstances exist in this case to exercise supplemental jurisdiction over plaintiff's remaining Pennsylvania common law retaliation claim based on the filing of his workers' compensation claim raised in Count I of his amended complaint. Since plaintiff's federal claims over which this court had original jurisdiction shall not be permitted to proceed to trial, the court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's state common law claim, Count I, against defendants. *Id.; see also* 28 U.S.C. §1367(c)(3); Verdecchia v. Prozan, 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).

As such, plaintiff's state common law retaliation claim shall be dismissed without prejudice. Kach, 589 F.3d at 650 ("If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.") (citation omitted).

## IV.    CONCLUSION

Based on the foregoing reasons, the court will **GRANT** defendants' motion for summary judgment with respect to plaintiff's retaliation claims under the ADAAA and the PHRA in Count II of his amended complaint. Further, since the plaintiff has not demonstrated that he had a disability under

the ADAAA, defendants' summary judgment motion will be **GRANTED** as to the plaintiff's disability discrimination claims under the ADAAA and the PHRA in Count II of his amended complaint. Plaintiff's state common law retaliation claim shall be **DISMISSED WITHOUT PREJUDICE**. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: August 13, 2019**

17-2127-01.wpd